Thomas Junior **REYNOLDS, Appellee-Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Appellant-Defendant.**

Supreme Court of Tennessee.

July 2, 1973.

Ernest F. Smith, Kingsport, for appellant; Hunter, Smith, Davis, Norris, Waddey & Treadway, Kingsport, of counsel.

Slaughter & Jackson, Bristol, for appellee.

## OPINION

JOHN W. WILSON, Special Justice.

The parties will be designated as in the trial court; that is, the appellee, Thomas Junior Reynolds, as plaintiff, and the appellant, Liberty Mutual Insurance Company, as defendant.

This action for compensation was filed in the Chancery Court of Sullivan County, Tennessee, on November 17, 1971, the plaintiff averring that on October 21, 1971, while in the course of his employment with Raytheon Company, he was injured while lifting a barrel weighing approximately 740 pounds; that as a result of the accidental injury, he suffered temporary disability from October 21, 1971 to November 8, 1971, and has incurred medical and hospital expenses, drug bills and has suffered permanent disability to his back, muscles, bones, and ligaments thereof, and suffered an additional permanent disability as a result of the reinjury of a dormant hernia.

The defendant, the insurance carrier for Raytheon, for answer, said it was without knowledge of how, where, and at what time the plaintiff sustained an injury as a result of the accident, and demanded strict proof. The allegations of plaintiff as to the cause of injury, resulting hospital and medical expenses, and permanent disability, are denied. The defendant denies that it was indebted to plaintiff in any manner whatsoever.

The trial court awarded no temporary disability, but awarded the plaintiff 25% partial permanent disability to the body as a whole, which award is now before the Court on appeal, and the defendant, while recognizing the rule that if there is substantial material evidence to sustain the finding of the trial court, the judgment will not be disturbed, earnestly insists from the entire record, that there is no

substantial evidence of a permanent partial disability related to the body as a whole.

The plaintiff testified he was 45 years of age and married; that he had worked at Raytheon two or three years before he got hurt on Thursday, October 21, 1971, while moving barrels on a two-wheel dolly truck, which truck he said you put under a barrel and cock it back. Plaintiff said he felt something "snap inside me"; that he was in pain and as soon as it happened he reported it to Mr. Lonzo Vance, his supervisor; that on the day he went to the medical department at the plant (first aid), that he was sent to Dr. Mooney, the company doctor; that Dr. Mooney couldn't find anything; that Dr. Mooney, on being informed by plaintiff that Dr. Sutterlin was his doctor and operated on him years ago, Dr. Mooney suggested he go to Dr. Sutterlin; that Dr. Sutterlin examined him and couldn't find anything wrong with him. Plaintiff continued to complain of his back hurting and Dr. Sutterlin said he wasn't a back specialist and got in touch with Raytheon and they wanted him to go to Dr. McFaddin; that Dr. McFaddin couldn't find anything wrong and his back kept hurting; that he had seen Dr. Collins, a chiropractor, after seeing Dr. McFaddin; that he went to see Dr. Mongle on his own, and went through the clinic out there, and they found nothing wrong; that the next day after he hurt himself he told a fellow worker, Bill Leonard, that he had hurt his back; that he returned to work at Raytheon and worked until February 7 or 8, 1972, at which time there was a work layoff. That at the time of the trial of this cause, he had pending but not processed, a claim for disability under the Social Security law.

That he went to see Dr. Stout on the _____ day of August, 1972, and had made a number of visits to Dr. Stout, and that he had been rendered a bill for $134.00 by Dr. Stout for his services.

Mr. Lonzo Vance, who has been employed by Raytheon for twenty years and was maintenance supervisor, testified he was not informed by the plaintiff that he had hurt himself until Monday, October 25, 1971, at which time the plaintiff claimed his injury was in the lower left side, and he sent Reynolds to company first aid.

Mr. Long, Raytheon employment and safety manager, testified that the first knowledge he had of a claimed injury by the plaintiff was on October 25, 1971; that his records were to the effect the alleged injury was to the lower left side.

Mrs. Reba Taff, who was employed as industrial nurse for Raytheon, testified that the records of her office show plaintiff reported injury to her on October 25, 1971, and the date of the injury as October 22, 1971; that Raytheon was advised by Dr. Sutterlin, "T. J. Reynolds has recovered from his injury of 10–22–71 and may return to work on 11–5–71." In addition Dr. Sutterlin advised Raytheon, by letter of 11–5–71:

"Gentlemen:

I am attaching herewith copy of initial Attending Physician Report, which is self-explanatory.

My original diagnosis was that Mr. Reynolds had merely pulled an adhesion of flat abdominal muscles, and that his pain would subside. Due to the fact that Mr. Reynolds is now improved, this seems to have been the correct diagnosis.

Mr. Reynolds was discharged November 4, 1971, without any disability. He returned to work on November 5, 1971.

> Yours very truly,
> /s/ Frank W. Sutterlin
> Frank W. Sutterlin, M. D."

Mrs. Helen Deehan, medical record administrator for Bristol Memorial Hospital, appeared as a witness and testified that medical records of the hospital revealed the following:

March 22, 1957 to March 28, 1957 and March 30, 1957, to April 2, 1957—

Treating physician Dr. Richardson, lumbar pneumonia and pulmonary fluid, type unknown; acute pneumonia, pleurisy with effusia on the right

May 28, 1960 to June 5, 1960—
Treating physician Dr. Mongle, operation left inguinal hernia

April 16, 1961 to April 23, 1961—
Treating physician Dr. Mongle, left inguinal hernia and scar tissue

January 16, 1964 to January 28, 1964—
Treating physician Dr. Mongle, myositis, a lumbar sacral muscle and bursitis, left hip joint region

September 29, 1964 to October 5, 1964—
Treating physician Dr. Sutterlin, ilioinguinal neuritis

March 4, 1968 to March 12, 1968—
Treating physician Dr. Harr, esophagitis refluxtion and a gastric ulcer

November 15, 1971 to November 21, 1971—
Treating physicians Drs. Mongle and Calcote, X-rays and IV polygram, lumbosacral spine and chest X-rays; interpretation of lumbosacral X-rays: "Unremarkable lumbosacral spine was the conclusion. The second conclusion was: Essentially unremarkable polygram.' No radiographic evidence of urinary tract. No X-ray abnormality of the bladder noted." Interpretation of chest X-rays: "borderline cardiomegalia. Mild diffuse pulmonary fibrosis bilaterally. No active pathology." Conclusion of the barium enema X-rays: "the left side of the colon suggested a possibility of old ulcerated colitis."

It appears from one of the exhibits that the plaintiff, having returned to work on November 8, 1971, with the approval of the medical doctors and being entitled to receive temporary total benefits under the Compensation Act for one week's temporary disability, was then paid, on that date, for the disability ceasing as of November

7, 1971, some $47.16, which the plaintiff admits receiving.

On November 17, 1971, the plaintiff, within thirty days of the alleged injury on October 21, 1971, filed the instant action and continued to work until the work layoff in February, 1972.

It appears that on some date subsequent to November 8, 1971, and prior to November 15, 1971, the plaintiff contacted his personal physician, Dr. Mongle, who, as shown by the hospital records above set out, had performed surgery to relieve a hernia. Upon reporting to Drs. Mongle and Calcote the plaintiff was hospitalized in the Bristol Memorial Hospital on November 15, 1971. We quote from the deposition of Dr. Claude M. Calcote:

"Q. Briefly, tell us what examination was made and tests were made of Mr. Reynolds while in the hospital.

A. Of course, he had a physical examination, which indicated the tenderness of the left lower quadrant of the abdomen as already described, all of which was non-specific, didn't point to anything in particular, except he was just having pain down there. He had an X-ray of his kidneys.

Q. Go ahead.

A. We X-rayed his kidneys and they were negative. X-rayed his back, they were likewise negative. He had had the complaint of lower bowel upsets for a long period of time, therefore, a barium enema was obtained, and this was reported as being suggestive of old ulcerated colitis, but nothing again specific. And the remainder of his work-up, basic laboratory studies were entirely within normal limits."

Dr. Calcote's testimony referred to no complaint of low back pains. On being asked to turn to the hospital record and give the last summary as of the date of

discharge of plaintiff on 11–21–71, gave the following answer:

"A. Forty-four year old male discharged from the hospital 11–21–71. He came to the hospital 11–15–71 thinking he had a hernia. He was checked out in both inguinal regions and this revealed no evidence of hernia and no reason for symptoms from the inguinal area. He was X-rayed. The only positive finding in this man was they said the mucosal pattern was smoothed out type of inside lining of the bowel indicating he possibly had spastic colitis and this probably might be condition. He has been on a low residue diet Mysteclin F and apparently made some improvement. The patient is discharged this date improved."

Dr. James G. McFaddin testified by deposition and stated he had practiced medicine for 25 years and his specialty was orthopedic surgery, which he had practiced in Bristol since 1958; that he had examined the plaintiff on November 2, 1971, upon the plaintiff being referred to him by Dr. Sutterlin. We quote the testimony of Dr. McFaddin, as follows:

"A. He stated that he hurt his back on or about the 22nd day of October, 1971, when he was putting a barrel on a dolly and he developed pain in his left inguinal area or groin. When he came to the office he was complaining of pain in this area, pain in the mid portion of his back, that is above waist level, and also said he had some pain running up into his neck.

Q. Did he complain to you at that time of any pain in the lumbar region?

A. No, sir, not in the lumbar region itself. It was not in the lower back, it was in the mid region, which would be lumbo dorsal rather than lumbosacral.

Q. At the time that you made your examination, did you have the benefit of any X-rays that were made, or did you make X-rays of his back?

A. We made X-rays here.

Q. Doctor, briefly, the pain that he complained of going up into his neck, could you demonstrate by palpation or any method that he did have any pain up in his neck?

A. Actually, I couldn't find anything wrong with this man other than— he had full and normal use of his upper extremities, lower extremities, and his back moved quite freely. I couldn't find any spasm. No deformity. I didn't check the man for hernia. That is out of my line. As far as I could determine this man had full and normal use of his back and his extremities. He had normal reflexes. He had normal X-rays. He didn't seem to have any prostatic or rectal disease, and I was not able to make any diagnosis."

Dr. McFaddin said his bill was paid by the defendant, Liberty Mutual Insurance Company, since it was referred as a compensation case.

In the order of elapsed time since the alleged injury, the next doctor was Dr. P. D. Stout, who had practiced medicine for forty years in general practice and doing skin diseases on the side as part of his general practice. He was first consulted by the plaintiff in August 1972, and he had seen the plaintiff for about fifteen times; that the plaintiff said he got hurt while working for Raytheon in October, 1971; that his office had administered diathermy and ultrasonic massage; that plaintiff explained that he was injured while using some kind of a two-wheel lift and, when he pulled back on it, he felt some kind of sound in his body, the doctor stating he

"had a poor way of describing it, I will tell you right off"; that he saw him last on November 28, 1972, and in the testimony referred to the plaintiff as "an odd kind of bird".

It appears from the record and exhibits that Dr. Stout, on October 27, 1972, had written a letter to Mr. Slaughter, plaintiff's attorney, in reference to the plaintiff, which the doctor referred to as his medical records. When the doctor testified as to what his record showed as of the last visit, on November 28, 1972, defendant objected because it was a postscript to his records, as stated in his letter of October 27, 1972; the doctor stated it was an addition to his medical record and he was permitted to read the addition. The letter of October 27, 1972, was offered as an exhibit as was the same letter with the postscript, or addition, added thereto. The latter exhibit addressed to Slaughter & Jackson, Attys., we quote as follows:

"Re: Mr. Thomas J. Reynolds

Dear Sirs:

Mr. Reynolds states he got hurt while working for the Raytheon Co. in October, 1971. He first consulted us in August, 1972. During his sojourn with our office he has been getting Diathermy and Ultra Sonic massage along with a variety of analgesics for relief of pain. He says he takes asperin regularly and a shot of whiskey nightly, as a rule. He further states he is afraid to drink much whiskey for fear of becoming an alcoholic, his disability has been so prolonged.

On physicial examination, his pulse was 80, tempt. 98.4, resp. 18, B.P. 146/94, height 5'7", and weight 175 lbs. His body motions were somewhat restricted and he states when he is in bed trying to sleep, his back gets sore and hurts.

Mr. Reynolds gave the following history concerning the various doctors he has seen since the injury: He first saw Dr. Mooney for 2 or 3 visits shortly after he was injured. Dr. Mooney referred him to Dr. Sutterlin and he saw him 2 or 3 times. The third doctor seen was Dr. McFaddin who X-rayed him. The fourth doctor was Drs. Mongle and Calcoate who hospitalized him for a week and then discharged him and released him to return to work but Mr. Reynolds states he hasn't been able to return to work.

Since we started treating him, he has had 7 or 8 Physeo Therapy treatments and he admits that he gets some relief from the treatments but it only lasts for a few days. The last time I saw him was October 24, 1972, and on that day he was complaining of pain and soreness and 'sickness' in his left side. On examination he directed me to examine the spinal side of the left scapula. I recognized no muscle spasma in the area referred to but he did complain of pain when forced body motions were demonstrated at the aforementioned area.

Apparently Mr. Reynolds received soft tissue injuries to his back but the numerous physicians who examined him from time to time did not find any marked evidence of said injuries. In spite of the fact however, it appears to me Mr. Reynolds is serious and conscientious about being disabled by the injuries he alleges to have and I myself have to more or less rely on what he describes in reaching any comprehensive conclusions concerning his disability.

I therefore pronounce him some 20 to 25% permanent partially disabled at this time, believing that he has reached maximum benefit from any treatments we can offer in the future or any other physician could be willing to suggest.

A bill for services rendered to this patient is enclosed in addition to the cost of this report.

> Very truly yours,
> /s/ P. D. Stout
> P. D. Stout, M.D.

PDS/clm

On Mr. Reynolds last visit on November 28, 1972, I took quite a long while to review his story of his injuries and the numerous physicians he was apparently forced to contact from time to time and in the course of this interview I learned he returned to work for approximately 2 months at Raytheon at which time he was laid off and has never been called back. Mr. Reynolds stated however he was not required to do any heavy lifting and he believed he could have continued in that capacity had he not been laid off.

In as much as the doctors he had seen prior to his return to work were more or less not inclined to offer him any other treatment or advice other than to work, he visited the out-patient department at the Bristol Memorial Hospital several times and Dr. Wlm. Schmidt saw him a time or two. Subsequently Dr. John Marcy saw him 2 or 3 times and referred him back to Dr. Schmidt. Apparently Dr. Schmidt got more or less fed up with him and suggested he see a psychiatrist. That kind of advice didn't hit an agreeable note with Mr. Reynolds so he consulted an attorney, Slaughter & Jackson. Slaughter & Jackson presumably sent him to me and I have treated him 14 times with diathermy to his back and gave him medication for pain from time to time and Mr. Reynolds admits he has been considerably benefitted by the treatments that we gave him.

It is my opinion that additional treatments such as we have given him will get him able to do some kind of work that will not be detrimental to his health."

Dr. Stout was asked the following questions:

"Q. Dr. Stout, as a result of your having taken a history from Mr. Reynolds, having made a diagnosis, and based upon your experience and skill, and your opinion, Dr. Stout, has the patient, Thomas Junior Reynolds, suffered an injury on the job as the result of heavy lifting, sometime in the fall of 1971 that will cause him residual difficulties to perform gainful manual employment that involves heavy lifting, bending, stooping and that sort of thing?

. . . . . .

A. I feel that he will have a vulnerable back and be quite easy to re-injure it, and he will come out with about a 25 per cent permanent disability.

Q. Is that to the body as a whole?

A. To the body as a whole."

On cross-examination, Dr. Stout said he examined no X-rays of plaintiff; that he knew nothing of how many times the plaintiff had been in the hospital; that he never looked at his hospital records; that he didn't know that he had had two hernia operations; that he did not examine the hospital records for the period he was hospitalized by Dr. Mongle and Dr. Calcote in November, 1971; that he did not discuss with any of the doctors examining the plaintiff in November, 1971. The doctor did not mention what experience he had had if any, with treating patients for back complaints, and it appears he relied entirely on subjective complaints. The record fails to substantiate the statement of plaintiff as recorded in the addition to the medical report of Dr. Stout under date of October 27, 1972, to the effect that the plaintiff was forced to see doctors. In brief review, the record shows when plaintiff complained to Raytheon on October 25, 1971, he was sent to the company doctor; that Dr. Mooney sent him to Dr. Sutterlin when plaintiff stated Dr. Sutterlin was his doctor; that Dr. Sutterlin, not being a back specialist, sent him to Dr. McFaddin. On his own, the plaintiff went to Dr. Mongle and Dr. Calcote and then, whether on his own or at the suggestion of Mr. Slaughter, he went to see Dr. Stout.

We here quote part of the trial court's findings, as follows:

"Now there is a medical statement in here by Dr. P. D. Stout, a reputable medical doctor, who testifies had a back damage, that he was injured in his back, that he had seen him some 15 times. He was the treating doctor. The other doctors who gave their statement in this case generally were doctors who only examined him for the purpose of evaluating his condition for medical testimony such as Dr. McFaddin and others saw him maybe for one time and referred him to another doctor. But Dr. Stout testified that he had seen him some 14 or 15 times, and that he examined him and had treated him, and that he had prescribed medications, and that he had prescribed relaxants and other treatment, heat treatments and that had applied heat treatments in depth diathermy treatments, I believe he referred to them as, which he stated consisted of heat treatments that went into penetration of the back area, so as to give him some relief, and he did seek some relief. But he does give some material testimony, and the Court, must, however, take into consideration though the entire man as he is. You are not dealing here with a man who had a sound physical, normal body at the time of the alleged injury, but you are dealing with a human being who had sustained on different occasions injuries, who had medical problems, medical difficulties, and the Court considers an aggravation of his condition and a worsening of his condition.

Dr. Stout said that he was, in his opinion, 25 per cent partially permanently disabled for the body as a whole as a result of the injury. The Court is of the opinion that the plaintiff did sustain an injury, which arose out of and in the course of his employment by moving a heavy barrel on the 21st day of October, 1971, and that he sustained the industrial injury in the course of his employment, and that it is compensable and that his recovery should be based upon a 25 per cent partial permanent disability to the body as a whole. The Court, therefore fixes his compensation based upon that partial percentage of disability.

The Court is further of the opinion that there is no basis for a temporary total disability in this case for the reason that the plaintiff did some work, returning to his job in the month of November, and stayed on his job until February of 1972, and the difficulty was computing his temporary disability, in the opinion of the Court, confronts the Court with problems which the ends of justice would be met if his disability was fixed at 25 per cent partial permanent disability."

Upon the appeal to this Court, the defendant assigns errors as follows:

ERROR NO. I:

The Trial Court erred in finding and adjudging that there was competent and substantial evidence to support plaintiff's claim of total disability to the body as a whole of 25%.

ERROR NO. II:

The Trial Court erred in finding and adjudging that there was competent and substantial medical evidence that the plaintiff, Reynolds, on October 21, 1971, while in the scope and course of his employment, sustained a permanent disability to the body as a whole under the provisions of the Workmen's Compensation Act of Tennessee.

ERROR NO. III:

The Trial Court erred in finding and adjudging that the unsupported, self-serving statements of the plaintiff, Reynolds, and the statements and conclusions of Philip D. Stout, M. D., beginning with August 21, 1972, and continuing through November 28, 1972 were sufficient to

establish Plaintiff Reynolds' Industrial disability benefits to the body as a whole, contrary to the medical findings of the examining doctors on the reported date of the alleged injury, October 25, 1971, and the clinical record referable to the plaintiff, Reynolds, by doctors of his selection, and subsequent reports showing minor involvement of a previous hernia operation.

## ERROR NO. IV:

The Trial Court erred in adjudging that the defendant, Liberty Mutual Insurance Company, was in equity estopped to challenge Plaintiff Reynolds' claim for benefits after making payment for one week's benefits of $47.16 on November 8, 1971.

## ERROR NO. V:

The Trial Court erred in denying Liberty Mutual's motion to strike and disregard the entire deposition of Dr. P. D. Stout because the opinions expressed therein were not based upon competent medical findings that Plaintiff Reynolds had sustained a compensable injury of 25% disability to the body as a whole flowing from the alleged accident on October 21, 1971.

## ERROR NO. VI:

The Trial Court erred in failing to find and adjudge that Plaintiff Reynolds' injury, if any, was temporary in nature, and his disability, if any, was as found and reported by Drs. Calcote and Mongle, the finding being 'Possibly had spastic colitis,' and was not compensable.

## ERROR NO. VII:

The Trial Court erred in finding and adjudging that Dr. P. D. Stout was entitled to receive payment for his services to the plaintiff, Reynolds of $134.00.

## ERROR NO. VIII:

The Trial Court erred in finding and adjudging that there was competent and substantial evidence for an award of 25% permanent partial disability to the body of the plaintiff, Reynolds, as a whole and holding that the same resulted from an Industrial accident on October 21, 1971, at the plant of Raytheon Company, Bristol, Tennessee.

We do not agree with the conclusion of the learned Chancellor when he states "the other doctors who gave their statement in this case generally were doctors who only examined him for the purpose of evaluating his condition for medical testimony, etc." We have above, in some detail, set out the order in which, and at whose request, Dr. Mooney, the company doctor, Dr. Sutterlin, Dr. McFaddin, Dr. Mongle and Dr. Calcote saw and examined the plaintiff, and it appears that these doctors were seeking to find some reason for the complaints made by the plaintiff. It is again noted that Dr. Mongle and Dr. Calcote, doctors of the plaintiff's own choosing, on November 15, 1971 placed plaintiff in the hospital for several days and the only positive finding made was a condition of the lower bowels, indicating possibly he had spastic colitis.

Nor do we agree with the trial court that Dr. Stout was the treating physician, as that term is generally understood, without qualification. While it is true Dr. Stout did treat the plaintiff by administering heat diathermy approximately ten months after the alleged injury of October 21, or 22, 1971, based on subjective symptoms alone, to say he was the treating physician would be to assume that the subjective complaint of pain was the result of an accidental injury sustained on October 21, 1971, which is the issue in this lawsuit.

In the case of Tom Still Transfer Company, Inc., et al. v. Jimmy Don Way,

Tenn., 482 S.W.2d 775 (1972), this Court said, on page 778:

"However, while lay testimony of the claimant is of probative value in establishing simple matters such as existence of pain, its location, inability to work etc., there are areas in which lay testimony is obviously incompetent. It has been consistently held that lay testimony in all but the most obvious cases is insufficient to support a finding of medical causation or a finding of permanent disability. Magnavox Company of Tennessee v. Shepherd, 214 Tenn. 321, 379 S.W.2d 791 (1964); Floyd v. Tennessee Dickel Distilling Company, Tenn. 463 S.W.2d 684 (1971)."

■ So the question narrows to this: Where there is an abundance of medical testimony that competent medical men can find no basis for complaint of pain and disability, by reason of an alleged accidental injury sustained at a given time, can permanent partial disability be allowed on the basis of testimony of another doctor based upon subjective complaints alone? We don't think so—otherwise, it would seem to destroy the rule above referred to in the cited cases.

■ We recall, upon argument of this case before the Court at Knoxville, on May 10, 1973, that a member of the Court, Mr. Justice Humphreys, while we are not able to recall his exact words, in substance inquired as follows: Is not the question of whether a doctor possesses the necessary expertise to testify to medical causation more of a question of law for the court than a question of evidence or fact? In this case we are of the opinion that Dr. Stout was not sufficiently qualified as an expert to establish medical causation between the alleged accidental injury and the disability allowed by the trial court.

■ We are of the opinion that there was no competent and substantial medical evidence that the plaintiff, on October 21, 1971 sustained a permanent disability to the body as a whole.

■ We are also of the opinion that the plaintiff is not entitled to recover from the defendant the $134.00 charge of Dr. Stout. The proof reveals that the defendant was liberal in providing the plaintiff for medical services at the time the plaintiff claimed he was injured. Some of the medical attention provided the plaintiff were doctors of the plaintiff's choosing. The proof is that he saw Dr. Stout approximately ten months after the alleged injury, at the request of his attorney, and without consulting the defendant. See Rice Bottling Co. v. Humphreys, 213 Tenn. 8, 372 S.W.2d 170 (1963); Consolidation Coal Co. v. Pride, 224 Tenn. 188, 452 S.W.2d 349 (1969).

We think the language of Chief Justice Dyer in Rice Bottling Co. v. Humphreys, supra, as used on page 13 of 213 Tenn., on page 173 of 372 S.W.2d, is applicable to the instant case and we quote:

"(5) The Chancellor found employee under the cirumstances was justified in incurring further medical expense to be paid by employer. We are not able to agree as we do not find any substantial evidence or reasonable inferences to be drawn from evidentiary facts to support a finding employee was justified, or in other words had a reasonable excuse, in incurring further medical expense without consulting employer."

We are of the opinion that the judgment of the trial court should be reversed and the case dismissed. The costs will be assessed against the plaintiff.

DYER, C. J., and CHATTIN, HUMPHREYS and McCANLESS, JJ., concur.